FILED
2020 Aug-04  PM 03:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **DOMINIQUE DARNELL,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:17-cv-00202-MHH** |
| | } | |
| **YAMAHA MOTOR** | } | |
| **CORPORATION, USA, et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

The plaintiff in this products liability case, Dominique Darnell, suffered injuries when she fell off the back of a Yamaha WaveRunner personal watercraft. Ms. Darnell contends that the WaveRunner was unmerchantable because it lacked devices that would prevent a passenger from falling backwards or stop the engine in the event of a fall. She seeks damages from defendants Yamaha Motor Corporation, USA, Yamaha Motor Manufacturing Corporation of America, and Yamaha Motor Co., Ltd., for breach of the implied warranty of merchantability under Alabama Code § 7-2-314. Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Yamaha has

moved for summary judgment on Ms. Darnell's claim.  (Doc. 48).  For the reasons explained below, the Court will grant the motion.  (Doc. 48).[1]

## I.      Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  FED. R. CIV. P. 56(c)(1)(A).  "The court need consider only the cited materials, but it may consider other materials in the record."  FED. R. CIV. P. 56(c)(3).

When considering a summary judgment motion, a district court must view the evidence in the record and draw reasonable inferences from the evidence in the light most favorable to the non-moving party.  *Asalde v. First Class Parking Sys. LLC*, 898 F.3d 1136, 1138 (11th Cir. 2018).  Accordingly, he Court views the evidence in the light most favorable to Ms. Darnell.

---

[1] Yamaha also has moved to exclude Ms. Darnell's expert witness.  (Doc. 50).  And Ms. Darnell has moved for partial summary judgment as to all of Yamaha's affirmative defenses.  (Doc. 43). Because the Court will grant Yamaha's summary judgment motion, these motions are moot.

## II. Background

The relevant facts concerning Ms. Darnell's accident are not in dispute.  On July 4, 2016, Ms. Darnell was riding as a rear passenger on a Yamaha WaveRunner jet ski at Logan Martin Lake in Alabama.  (*See* Doc. 47-1, pp. 18–19, tpp. 65–72; Doc. 47-8; Doc. 47-9, pp. 12–15, tpp. 42–54).  The seat of the WaveRunner is designed to carry up to three people:  the driver and one or two back passengers. (*See* Doc. 47-8).  The WaveRunner does not have handles, straps, or a bar for back passengers to grasp; it has handlebars only for the driver.  (*See* Doc. 47-8).

Several warning labels are affixed to the WaveRunner.  For example, the label under the front handlebars states:

> ⚠ WARNING
>
> - Read the Owner's Manual, the Riding Practice Tips, the Riding Instructions card, and all labels before operating; and
>
> - Wear a wetsuit to protect against injuries to orifices (rectum and vagina) from strong streams of water from the jet nozzle, or from impact with the water surface. …
>
> - Passengers should firmly hold on to the person in front of them and place feet on the footrest floor. Otherwise, passengers could lose balance and fall.

(Doc. 47-8, p. 6).  The label on the rear of the WaveRunner provides:

 WARNING

- Strong streams of water from the jet nozzle can be dangerous, and can result in serious injury when directed at the body orifices (rectum and vagina).

- Wear a wetsuit to protect body.

- Do not board vehicle if operator is applying throttle.

(Doc. 47-8, p. 4). Ms. Darnell was not wearing a wetsuit on the day of her accident. (Doc. 47-11, p. 15, tpp. 53-56).

At the time of the accident, Ms. Darnell was seated behind the driver, Thomas Moland, holding on to the straps of his lifejacket. (Doc. 47-9, pp. 13–14, tpp. 48–49). At some point, while the WaveRunner was travelling across the water, Ms. Darnell fell in the lake. (Doc. 47-9, p. 16, tp. 57). She testified: "I just know we were heading back and the next thing I know I was in the water. I'm not sure -- I fell directly off, and I'm not really sure how, like what exactly happened." (Doc. 47-9, p. 16, tp. 57). Mr. Moland testified that he does not know how Ms. Darnell fell; he simply "turned around and looked" and saw her in the water. (Doc. 47-1, p. 21, tp. 77).

After the fall, Ms. Darnell needed medical attention. An ambulance took her to UAB Hospital. (Doc. 47-9, p. 19, tp. 70). She stayed at the hospital for seven days to receive treatment for gastrointestinal injuries, went home for a week, and then returned to the hospital for a 12-day stay for more treatment. (Doc. 47-9, pp. 19–20, tpp. 70–73). At her deposition, she testified that she needed physical therapy

4

and surgery for a hernia and a diastasis recti (separation of the abdominal muscles) that had developed as a result of the trauma she suffered in the accident. (Doc. 47-7, p. 19, tpp. 70–72).

Seeking compensation for her injuries, Ms. Darnell sued Yamaha for breach of the implied warranty of merchantability under Alabama Code § 7-2-314.  (Doc. 1, pp. 4–5).  In her complaint, Ms. Darnell contends that Yamaha breached the implied warranty of merchantability for the WaveRunner because "[t]he jet ski was defective and not fit for the ordinary purposes for which the jet ski was to be used." (Doc. 1, p. 4, ¶ 22).   She asserts that the WaveRunner "was designed and manufactured to carry passengers but was not designed or manufactured with a fixed handle, seat strap, backrest, raised seat back, 'sissy bar,' or other device to prevent passengers from falling backward into the water.  It also did not have an engine cutoff, or 'kill' switch, for passengers seated in the rear of the jet ski to utilize in the event they were unintentionally ejected from their seat."  (Doc. 1, pp. 4–5, ¶ 23).

Yamaha contends that the defendants are entitled to judgment as a matter of law on Ms. Darnell's implied warranty of merchantability claim because the Alabama Extended Manufacturer's Liability Doctrine – the AEMLD -- subsumes or

forecloses Ms. Darnell's breach of warranty claim, and she lacks evidence to prove causation.  (Doc. 48, pp. 1–2).[2]

### III.   Analysis

#### A.   Ms. Darnell's Theory of Recovery:  U.C.C. vs. AEMLD

When a consumer is injured while using a manufacturer's product, the consumer frequently will assert tort claims against the product manufacturer or distributor to recover damages for her injuries.  Under Alabama law, those tort claims include design or manufacturing defect claims or failure to warn claims under the AEMLD and common law claims for negligent or wanton design or manufacture. *Spain v. Brown & Williamson Tobacco Corp.*, 872 So. 2d 101, 106 (Ala. 2003).[3] Those tort claims likely were not appealing to Ms. Darnell because of the defenses that a manufacturer may raise to those claims.  For example, a manufacturer may defend against an AEMLD claim by showing that it warned against the injury that the plaintiff suffered, and the plaintiff failed to heed the warning.  (Doc. 44).

Tort defenses are not available to a manufacturer when an injured consumer brings a claim against the manufacturer under the Uniform Commercial Code or

---

[2] Based on its theory that Ms. Darnell's warranty claim is just an AEMLD claim masquerading as a warranty claim, Yamaha also argues that Ms. Darnell lacks admissible expert witness testimony to support a design defect claim, and she lacks evidence of an available, existing safer alternative design.

[3] To prevail under the AEMLD, a plaintiff must prove that the product that caused her injury was unreasonably dangerous.  *Casrell v. Altec Indus., Inc.*, 335 So. 2d 128, 132 (Ala. 1976).

U.C.C.  (Doc. 44).  Under the U.C.C., merchants may be subject to liability for selling goods that breach the implied warranty of merchantability, a guarantee that the goods are "fit for the ordinary purposes for which such goods are used."  Ala. Code § 7-2-314(1), (2)(c).

The Alabama Supreme Court has issued several decisions that explain the distinction between the tort standard and the warranty standard for manufactured goods.  The Alabama Supreme Court first described the relationship between AEMLD claims and U.C.C. breach-of-implied-warranty claims in *Shell v. Union Oil Co.*, 489 So. 2d 569 (Ala. 1986).  That case was before the Alabama Supreme Court on an appeal from a summary judgment order.

The evidence in *Shell* indicated that, while working in a Goodyear plant, Mr. Shell was exposed to a naphtha product supplied to Goodyear by the defendants. The naphtha product contained benzene, a carcinogen.  Mr. Shell sued the defendants for breach of the implied warranty of merchantability of the naphtha product under Ala. Code § 7-2-314.  Mr. Shell asserted that, "because the substance supplied by Defendants caused cancer, it could not be 'fit for the ordinary purposes for which such goods are used'; that is, because this is a cancer-causing substance, it is unreasonably dangerous, and, therefore, cannot be merchantable."  *Shell*, 489 So. 2d at 571.

The Alabama Supreme Court disagreed. The Alabama Supreme Court explained that the U.C.C. governs a claim that a product breached the implied warranty of "*commercial* fitness and suitability"—*i.e.*, the warranty that the "'[product was] fit for the ordinary purposes for which such goods are used.'" *Shell*, 489 So. 2d at 571–72 (emphasis and alterations in original) (quoting Ala. Code § 7-2-314). The Alabama Supreme Court recognized that the naptha product contained an "inherently dangerous chemical compound," 489 So. 2d at 570, and looked to the warnings that accompanied the product to evaluate the product's commercial fitness. The evidence demonstrated that benzene was a monitored chemical, that the material safety data sheets that accompanied naptha shipments from the defendant suppliers advised those using the product to wear safety gear and take immediate steps to wash the product away should it come into contact with skin, and that Goodyear conducted sampling to ensure that the benzene levels in the naptha product did not exceed permissible levels. 489 So. 2d at 570. Given the information accompanying the product that described the steps necessary for safe use, the Alabama Supreme Court held that the naptha product, "made to Goodyear's specifications—performed the job it was intended to do; and the manufacturers' warnings and precautions, accompanying the products, were in keeping with their knowledge of its inherent dangers" so that "these undisputed facts do not give rise to a warranty of merchantability, as contended by Shell." 489 So. 2d at 572.

The Alabama Supreme Court noted that Mr. Shell effectively was complaining that the naptha product "was unreasonably dangerous," such that he "must find [his] remedy outside the warranty remedies afforded by the U.C.C." *Shell*, 489 So. 2d at 572. The Alabama Supreme Court stated that under Alabama law, there is a "clear distinction between causes of action arising under tort law and those arising under the U.C.C. as adopted in Alabama." *Shell*, 489 So. 2d at 571. Summing up, the Alabama Supreme Court opined: "Whether this product was unreasonably dangerous, therefore, is not a question properly addressed in an action brought under the provisions of the U.C.C. That question could properly be raised in an action brought under Alabama's Extended Manufacturer's Liability Doctrine (A.E.M.L.D.), but not in this U.C.C. action for breach of warranty."

The Alabama Supreme Court reiterated the distinction between an AEMLD claim and a U.C.C. breach of implied warranty of merchantability claim in *Yarbrough v. Sears, Roebuck & Co.*, another case in which the Alabama Supreme Court reviewed a summary judgment ruling. *Yarbrough v. Sears, Roebuck & Co.*, 628 So. 2d 478 (Ala. 1993). The evidence in that case demonstrated that Mr. Yarbrough bought a kerosene heater. The heater was sold with instructions and warnings for safe use. Those warnings included an instruction that the buyer should not use gasoline to fuel the heater. The written instructions provided with the heater stated:

> Never use any fuel other than water-clear kerosene (ASTM No. 1–K
> kerosene). Never use gasoline. Use of gasoline can lead to
> uncontrollable flames resulting in destructive fire. Even kerosene
> contaminated with small amounts of gasoline, or similarly volatile
> materials, can be hazardous. Never use a can for kerosene that has
> previously been used for gasoline, paint thinner, or solvents.

628 So. 2d at 481.  A label on the side of the heater included the following warning:

> Risk of explosion. Never use gasoline or other inflammable liquids in
> this heater.  Use only water-clear ... kerosene.

628 So. 2d at 481.  Mr. Yarbrough put gas in the kerosene heater, and the heater

caught fire.  628 So. 2d at 480.

Mr. Yarbrough asserted tort claims against Sears under the AEMLD for the

sale of a defective, unreasonably dangerous product and for negligent and wanton

design and failure to warn, and he asserted a claim against Sears for breach of the

implied warranty of merchantability.   His warranty claim was based on his

contention that the heater was unreasonably dangerous as designed "and therefore

could not be merchantable."  628 So. 2d at 483.

On the evidence before it, the Alabama Supreme Court affirmed the trial court

order granting Sears's motion for summary judgment.  The Alabama Supreme Court

opined:

> The heater at issue was designed to be fueled with only kerosene. When
> it is used properly—that is, fueled with kerosene—it meets an ordinary
> consumer's expectation by heating the house.

628 So. 2d at 481.   After evaluating Mr. Yarbrough's tort claims, the Alabama

Supreme Court stated that under Alabama law, Mr. Yarbrough could not recast his

claim that the heater was unreasonably dangerous as a warranty claim.

> "Such an argument ignores the clear distinction between causes of
> action arising under tort law and those arising under the U.C.C. as
> adopted in Alabama." *Shell v. Union Oil Co.*, 489 So. 2d 569, 571 (Ala.
> 1986).  Whether the kerosene heater was unreasonably dangerous is not
> a question properly addressed in a claim alleging breach of warranty
> under the U.C.C., but it could be, and was, properly raised in a claim
> under the AEMLD.

*Yarbrough*, 628 So. 2d at 483.   Years later, discussing its decision in *Yarbrough*, the

Alabama Supreme Court highlighted the warnings that accompanied the heater and

noted that "[t]he Yarbroughs did not present any evidence indicating that the heater

was '[un]fit for the ordinary purposes for which such goods are used.'"   *Spain v.*

*Brown & Williamson Tobacco Corp.*, 872 So. 2d 101, 108 (Ala. 2003) (quoting

*Shell*, 489 So. 2d at 571).

In *Spain,* the Alabama Supreme Court, on a certified question from the United

States Court of Appeals for the Eleventh Circuit, examined the viability of a claim

for breach of the implied warranty of merchantability with respect to the sale of

cigarettes.   After smoking for many years, Mrs. Spain developed lung cancer and

died.   The defendants in *Spain* removed that Alabama wrongful death action to

federal court and then moved to dismiss the complaint pursuant to Rule 12 of the

Federal Rules of Civil Procedure.   The district court dismissed with prejudice Mr.

Spain's claims for design defect and failure to warn under the AEMLD, negligence, wantonness, and breach of the implied warranty of merchantability. *Spain v. Brown & Williamson Tobacco Corp.*, 230 F.3d 1300, 1303-04 & n.2 (11th Cir. 2000).[4]  Mr. Spain appealed, and the Eleventh Circuit certified several questions to the Alabama Supreme Court.

In its opinion certifying the questions to the Alabama Supreme Court, relying on Mr. Spain's complaint, the Eleventh Circuit recounted that Mrs. Spain "started smoking cigarettes in 1962, when she was 'approximately 15 years of age and was a multi-pack per day smoker.' She became addicted to the nicotine in cigarettes early on and was unaware at the time that she was becoming addicted."  230 F.3d at 1303 (quoting Mr. Spain's complaint).  The Eleventh Circuit pointed out that "federally mandated warnings" concerning the dangers of smoking cigarettes "did not appear until well after" 1962.  But, citing *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504 (1992), the Eleventh Circuit reasoned that "there is evidence that people in general knew prior to 1962 that smoking is dangerous to health." 230 F.3d at 1308-09.  With respect to Mr. Spain's claim for breach of the implied warranty of merchantability, the Eleventh Circuit stated:

> As we read Spain's complaint, his theory is that the cigarettes were unfit for the ordinary purpose for which they are used because they caused cancer, making them unreasonably dangerous and not merchantable. The Alabama Supreme Court rejected a similar claim and stated that

---

[4] Mr. Spain also asserted a conspiracy claim under Alabama law.

> "[s]uch an argument ignores the clear distinction between causes of
> action arising under tort law and those arising under the [Uniform
> Commercial Code] as adopted in Alabama." *Shell v. Union Oil Co.,* 489
> So. 2d 569, 571 (Ala. 1986) (no claim for breach of warranty regarding
> product containing benzene, a carcinogen known to cause leukemia,
> when product was in conformance with specifications; such a claim is
> instead an AEMLD action). Unless the Alabama Supreme Court tells
> us differently, we are convinced that the complaint does not state a
> claim for breach of an implied warranty of merchantability.

230 F.3d at 1310-11.

The Alabama Supreme Court disagreed with the Eleventh Circuit's analysis

of Mr. Spain's warranty claim and discussed at length the line of Alabama decisions

concerning the distinction between product defect claims that plaintiffs frame as tort

claims and warranty claims concerning the commercial fitness of a product.  The

Alabama Supreme Court began by noting that the factual allegations relating to Mr.

Spain's breach of warranty claim were sparse:

> The foregoing bare-bones facts are before us. Carolyn became a heavy
> smoker after beginning to smoke in 1962 when she was approximately
> 15 years old. We know that she became addicted to the nicotine in
> cigarettes. We know that she was unaware of her addiction at the outset.
> She alleges in her complaint that she was unable to stop smoking. She
> was diagnosed with lung cancer on August 15, 1998, and died within
> one year.

872 So. 2d 105.  Listing the various facts that had yet to be developed concerning

Mr. Spain's claim, the Alabama Supreme Court observed:

> Facts not before us are legion. Spain points out that the federal district
> court dismissed his complaint before any discovery began. Presumably,
> as common sense suggests, Carolyn at some point became aware that

she was addicted to cigarettes, but we do not know that for sure. We do not know whether Carolyn experienced any physical consequences of smoking before she was diagnosed with lung cancer in 1998 . . . We know from matters generally regarded as public knowledge that the surgeon general of the United States has mandated the inclusion of warnings on packages of cigarettes since sometime in the 1960s. We further know that the text of the warning has been adjusted over the years. However, the parties have not furnished us with information regarding the various formulations in the text and the dates of the changes.

872 So. 2d at 105. The information not before the Alabama Supreme Court was significant because, "[i]n each case alleging a breach of the implied warranty of merchantability, the determination whether there was a breach requires a fact-intensive analysis." 872 So. 2d at 108.

Turning to the facts relating to the *Shell* case, the Alabama Supreme Court explained that it affirmed summary judgment in favor of the distributors of the carcinogenic substance in that case because the facts in that case demonstrated that "the naphtha product was 'fit for the ordinary purposes for which such goods are used.'" 872 So. 2d at 108 (quoting *Shell*, 489 So. 2d at 571). The Alabama Supreme Court highlighted the following analysis in the *Shell* decision:

To cover the initial bare bones question (Was there a duty owed?) with flesh, we should reask the question: Did the sale of the subject product give rise to an implied warranty of merchantability in the sense that these two manufacturers promised the employee that he would not be injured by his use of or contact with their product? The answer must be made in the context of § 7–2–314: '[Whether this product was] fit for the ordinary purposes for which such goods are used.' *In this instance, the product—made to [the employer's] specifications—performed the job it was intended to do; and the manufacturers' warnings and*

14

*precautions, accompanying the products, were in keeping with their knowledge of its inherent dangers. Thus, any duty arising under this section of the Code was not breached.* Indeed, more precisely, these undisputed facts do not give rise to a warranty of merchantability, as contended by Shell.

872 So. 2d at 107 (quoting *Shell*, 489 So. 2d at 571-72) (emphasis in *Spain*, not is *Shell*). The Alabama Supreme Court cautioned: "*Shell* does not stand for the proposition that a product 'unfit for the ordinary purposes for which such goods are used' cannot be unmerchantable." 872 So. 2d at 108.

Turning to *Yarbrough*, as noted, the Supreme Court stated that it affirmed summary judgment on the warranty claim in that case because the Yarbroughs "did not present any evidence indicating that the heater was '[un]fit for the ordinary purposes for which such goods are used.'" *Spain*, 872 So. 2d at 108 (quoting *Shell*, 489 So. 2d at 571).

Then, the Alabama Supreme Court reviewed its decision in *Ex parte General Motors Corp.*, 769 So. 2d 903 (Ala. 1999). In that case, the plaintiff bought a car that turned out to be a lemon. The plaintiff testified that shortly after he bought the car, it began stalling and would stall an average of three times per week. The dealer tried to repair the car, but the car continued to stall. Once, when the car stalled, the power steering and brakes failed, and the plaintiff lost control of the car. The car slid into a utility pole, and the plaintiff was injured in the accident. *Spain*, 872 So. 2d at 109; *General Motors*, 769 So. 2d at 905-06. The plaintiff asserted against the

dealer a claim for breach of the implied warranty of merchantability. The trial court entered judgment for the dealer on that claim, and the Alabama Supreme Court reversed, finding that disputed questions of fact precluded summary judgment.

Describing the aspects of its decision in *General Motors* that bore upon the certified question in *Spain*, the Alabama Supreme Court wrote:

> '[t]o *establish his claim of breach of the implied warranty of merchantability, Tucker must " 'prove the existence of the implied warranty, a breach of that warranty, and damages proximately resulting from that breach.'"* '[*Tucker v. General Motors Corp.,*] 769 So.2d [895,] 901 [(Ala.Civ.App.1998)] (quoting *Barrington Corp. v. Patrick Lumber Co.,* 447 So.2d 785, 787 (Ala.Civ.App.1984), quoting, in turn, *Storey v. Day Heating and Air Conditioning Co.,* 56 Ala.App. 81, 83, 319 So.2d 279, 280 (1975)). Because this case is before this Court on appeal from a summary judgment in favor of GM and Bishop, we are concerned only with whether Tucker presented substantial evidence of each of these three factors so as to create a jury question.
>
> As we have mentioned above, the only evidence in the record is Tucker's deposition and his affidavit. They contain uncontroverted evidence that Tucker purchased the car in question from Bishop [the automobile dealer]. It appears undisputed that Bishop is a 'seller' of automobiles, as that term is defined in § 7–2–103, Ala. Code 1975. Thus, § 7–2–314's requirement that the seller be a 'merchant with respect to goods of that kind' is met, and the record shows that Tucker has presented substantial evidence of the existence of the implied warranty. The record also contains evidence tending to establish a breach of the implied warranty of merchantability, because there was undisputed evidence tending to show that the car stalled repeatedly while Tucker was driving it and that Bishop failed to correct the problem when he took the car to Bishop for repair.
>
> . . .
>
> [Under the AEMLD], in defining 'defect,' this Court incorporated into AEMLD law some of the analysis applicable in cases arising, as does

this one, under the UCC doctrine of the implied warranty of merchantability. *Id.* Specifically, *this Court has combined the doctrine of 'fitness for the ordinary purpose intended' of UCC law and the tort concept of 'unreasonably dangerous' in defining 'defect'* See *Haven Hills Farm,* supra, for further discussion of AEMLD law.

We do not believe the fact that this Court borrowed some principles from UCC law in developing a definition of 'defect,' as that term is used in AEMLD cases, forces the conclusion that principles of AEMLD law are always applicable in cases involving the implied warranty of merchantability. In fact, this Court has continued to recognize the clear distinction between AEMLD law and UCC law. See *Yarbrough v. Sears, Roebuck & Co.,* 628 So.2d 478 (Ala.1993), and *Shell v. Union Oil Co.,* 489 So.2d 569 (Ala.1986).

. . .

*Given the uncontradicted evidence in this case, we conclude that Tucker presented substantial evidence of a breach of the implied warranty of merchantability and of damage and thereby created a genuine issue of material fact.*

872 So. 2d at 110-11 (quoting *General Motors*, 769 So. 2d at 912-13) (emphasis in *Spain).*

Closing its discussion of Mr. Spain's claim for breach of implied warranty of merchantability, the Alabama Supreme Court stated unequivocally:  "a claim alleging breach of an implied warranty of merchantability is separate and distinct from an AEMLD claim and is viable to redress an injury caused by an unreasonably dangerous product."  *Spain*, 872 So. 2d at 111; *see also Ex parte Integra LifeSciences Corp.*, 271 So. 3d 814, 820 (Ala. 2018) ("A breach-of-warranty claim, however, is

'separate and distinct from an AEMLD claim.'") (quoting *Spain*, 872 So. 2d at 111).

Applying state court pleading standards, the Alabama Supreme Court held:

> In paragraph 21 of his complaint, Spain alleged that the cigarettes designed, manufactured, and sold by the manufacturers "were not fit for the ordinary purposes for which they are used." Thus, he alleged a breach of the implied warranty of merchantability. Because this case is before the Eleventh Circuit on a motion to dismiss, the record before us does not contain any evidence indicating that the cigarettes smoked by Carolyn *were* "fit for the ordinary purposes for which they are used." Therefore, this case is factually distinguishable from *Shell* and *Yarbrough*.

*Spain*, 872 So. 2d at 108-09.

The Alabama Supreme Court was clear and direct in *Spain*; "a claim alleging breach of an implied warranty of merchantability is separate and distinct from an AEMLD claim and is viable to redress an injury caused by an unreasonably dangerous product." *Spain*, 872 So. 2d at 111. Therefore, the Court is not persuaded by Yamaha's argument that the AEMLD subsumes Ms. Darnell's warranty claim. If Ms. Darnell can identify disputed facts that would enable a jury to find an implied warranty of merchantability, then Ms. Darnell may proceed with her warranty claim. To decide whether Ms. Darnell is entitled to a trial, we turn to the evidence concerning her warranty claim, mindful of the Alabama Supreme Court's instruction that a court's review of a breach of warranty claim under Alabama law "requires a fact-intensive analysis." *Spain*, 872 So. 2d at 108.

B.    Ms. Darnell's Evidence

Factually, this case resembles the *Shell* case.  The evidence shows that a WaveRunner jet ski is intended to transport passengers across the surface of water for recreation.  The WaveRunner that Ms. Darnell rode on July 4, 2016 did just that. Mr. Moland, who was driving the WaveRunner, testified that he had ridden on the jet ski roughly three or four times before on the lake.  (Doc. 47-1, p. 15, tp. 55). There is no evidence that the WaveRunner stalled or malfunctioned in any way while Ms. Darnell was riding on it.  *Compare General Motors*.  Mr. Saunders, the owner of the WaveRunner, continued driving it on the lake with passengers after Ms. Darnell's accident until he sold the WaveRunner to Ms. Darnell's lawyers.  (Doc. 47-11, pp. 23–24, tpp. 88–90).  This evidence demonstrates that the WaveRunner operated as intended such that it was commercially "fit for the ordinary purposes for which such goods are used."  *See* Ala. Code § 7-2-314(2)(c).

Yamaha did not warrant that the WaveRunner was accident-proof or that a passenger never would fall from the watercraft.  To the contrary, Yamaha advised passengers that they could fall from the WaveRunner and warned riders to wear wetsuits to prevent injuries like the ones Ms. Darnell suffered.  As noted, the label under the front handlebars states:

 WARNING

- Read the Owner's Manual, the Riding Practice Tips, the Riding Instructions card, and all labels before operating; and

- Wear a wetsuit to protect against injuries to orifices (rectum and vagina) from strong streams of water from the jet nozzle, or from impact with the water surface. …

- Passengers should firmly hold on to the person in front of them and place feet on the footrest floor. Otherwise, passengers could lose balance and fall.

(Doc. 47-8, p. 6).  The label on the rear of the WaveRunner provides:

⚠ WARNING

- Strong streams of water from the jet nozzle can be dangerous, and can result in serious injury when directed at the body orifices (rectum and vagina).

- Wear a wetsuit to protect body.

(Doc. 47-8, p. 4).

Given this undisputed evidence, under Alabama law, Yamaha did not provide an implied warranty that Ms. Darnell would not fall from the WaveRunner and be injured.  To paraphrase *Shell* and *Spain*:

Did the sale of the subject product give rise to an implied warranty of merchantability in the sense that [Yamaha] promised the [WaveRunner passenger] that he would not be injured by his use of or contact with [its] product? The answer must be made in the context of § 7–2–314: '[Whether this product was] fit for the ordinary purposes for which such goods are used.' *In this instance, the product . . . performed the job it was intended to do; and the manufacturers' warnings and precautions, accompanying the products, were in keeping with their knowledge of*

20

> *its inherent dangers. Thus, any duty arising under this section of the*
> *Code was not breached.* Indeed, more precisely, these undisputed facts
> do not give rise to a warranty of merchantability, as contended by [Ms.
> Darnell].

*Spain*, 872 So. 2d at 107 (quoting *Shell*, 489 So. 2d at 571-72) (emphasis in *Spain*).

Ms. Darnell argues that "[t]he purpose of a 2- or 3-person PWC is to *safely*

ride a passenger around on the water for entertainment" and that the PWC was not

fit for this purpose "because it is designed to permit passengers to foreseeably fall

off directly backwards, with legs spread, into the high-pressure from the jet nozzle."

(Doc. 56, pp. 20–21) (emphasis added).  But *Shell*, *Yarbrough*, and *Spain* indicate

that the scope of a warranty may be discerned from the available warnings.  The

naphtha product in *Shell* was not unmerchantable because it caused cancer, and the

kerosene heater in *Yarbrough* was not unmerchantable because it posed a fire risk

when fueled with gasoline.  The defendants in those cases warned against those very

risks and provided products that served the purpose for which they were designed,

with instructions that mitigated against the attendant risks associated with the

products.  Unlike the car in *General Motors*, the products in *Shell* and *Yarbrough*

functioned as designed.  So did the WaveRunner in this case.  The risk of falling off

the personal watercraft in this case has no bearing on its merchantability, given the

warnings and instructions that accompanied the product.  Because Yamaha did not

warrant that passengers would not fall from the WaveRunner or would not be injured

if they wore only a swimsuit while riding, Ms. Darnell's warranty claim fails as a matter of Alabama law.

To the extent that Ms. Darnell contends that Yamaha should have designed the WaveRunner jet ski differently to include, for example, a backrest or an engine cutoff, (Doc. 1), her product defect theory sounds in tort, not warranty, and she did not assert a tort claim in her complaint.  Therefore, the Court will not consider evidence or arguments concerning alternative jet ski designs at this stage of the litigation.

## IV.  Conclusion

For the foregoing reasons, by separate order, the Court will grant Yamaha's motion for summary judgment as to Ms. Darnell's claim for breach of the implied warranty of merchantability.

**DONE** and **ORDERED** this August 4, 2020.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

22